NOT FOR PUBLICATION

**FILED**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

OCT 14 2021

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| FRANCES GALLARDO, an individual and as successor in interest to Josue Gallardo, deceased,<br><br>Plaintiff-Appellant,<br><br>v.<br><br>COUNTY OF SAN LUIS OBISPO; SAN LUIS OBISPO COUNTY SHERIFFS DEPARTMENT; IAN PARKINSON, San Luis Obispo County Sheriff, individual and official capacity; JONATHAN CALVERT, Deputy, individual capacity and official capacity; GREG ROACH, Deputy, individual capacity and official capacity; DOES, 1 to 10, inclusive,<br><br>Defendants-Appellees. | No. 20-55825<br><br>D.C. No.<br>2:18-cv-09835-DDP-AFM<br><br>MEMORANDUM* |

Appeal from the United States District Court
for the Central District of California
Dean D. Pregerson, District Judge, Presiding

Argued and Submitted September 13, 2021
Pasadena, California

Before: GOULD, BERZON, and COLLINS, Circuit Judges.

---

\* This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

In this action brought under 42 U.S.C. § 1983, Plaintiff Frances Gallardo ("Gallardo") appeals the district court's grant of summary judgment to Defendants, San Luis Obispo County Sheriff's Department Deputies Jonathan Calvert and Gregory Roach. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

1. Gallardo has not raised issues of material fact as to whether Roach and Calvert reasonably used deadly force against her deceased husband, Josue Gallardo ("Josue"). We review a grant of summary judgment *de novo* to determine whether "a rational trier of fact might resolve the issue in favor of the nonmoving party." *S.R. Nehad v. Browder*, 929 F.3d 1125, 1132 (9th Cir. 2019) (quoting *Blankenhorn v. City of Orange*, 485 F.3d 463, 470 (9th Cir. 2007)), *cert. denied* 141 S. Ct. 235 (2020). In excessive force cases, we look to the totality of the circumstances to determine the reasonableness of the officers' conduct, considering, among other things, "whether the suspect posed an immediate threat to anyone, whether the suspect resisted or attempted to evade arrest, and the severity of the crime at issue." *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The "most important single element" of the analysis is whether the suspect posed an immediate threat, *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc) (quoting *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994)), and it is "unquestionably reasonable for police to shoot a suspect in [Josue's] position if he reaches for a gun" on his person, *Cruz v. City of Anaheim*, 765 F.3d 1076, 1078

(9th Cir. 2014).

The district court correctly concluded that, on the record before it, no rational jury "could conclude that [Josue], contrary to Roach's version of events, did *not* draw a gun on Calvert."[1] First, the report of Gallardo's biomechanics expert does not create a triable issue of material fact. Under Federal Rule of Evidence 702, scientific expert evidence is admissible only "if the principles and methodology used by the expert proffering it are grounded in the methods of science." *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 605 (9th Cir. 2002). Gallardo's expert's conclusions that Josue was attempting to comply with Calvert's orders and that his pants pocket was an awkward place to fit a gun do not follow from the bullet trajectory analysis set forth in his report. Moreover, even if Gallardo's expert report were admissible, the report's conclusion that Josue was shot in the back does not contradict Roach's account. Rather, that body position is consistent with the dash-cam video and with Roach's statements that Josue drew the gun from his pocket and brought it "in an upward crossing motion . . . in . . . the direction of" Calvert.

---

[1] It does not matter that the deputies later determined Josue possessed only a BB gun rather than an actual pistol. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. The BB gun was a realistic replica of a Walther PPK pistol. Gallardo does not dispute that, at the time of the encounter, the deputies could not have distinguished the BB gun from an actual pistol.

Nor does the photograph of Josue's pants create a triable issue of fact. Gallardo provides no photograph of the correct pocket, no measurements of the pocket, no measurements of the BB gun recovered from inside Josue's car, and no explanation for why the photograph shows Josue could not have fit the BB gun inside his pocket.

Apparently suggesting that officers planted or moved Josue's gun after the shooting, Gallardo also points out that the Sheriff's Department did not photograph the position of Josue's BB gun before removing it from the vehicle and that, sometime after the shooting, an officer shouted instructions not to take pictures. But this kind of "[m]ere allegation and speculation" does "not create a factual dispute for purposes of summary judgment." *Loomis v. Cornish*, 836 F.3d 991, 997 (9th Cir. 2016) (quoting *Nelson v. Pima Community College*, 83 F.3d 1075, 1081–82 (9th Cir. 1996)). The record includes a photograph and a receipt showing that Josue purchased the BB gun recovered at the scene. A video taken after the shooting shows Roach quickly recovering the BB gun from inside Josue's vehicle and so confirms that he did not plant it or find it in an inaccessible location. And whatever their reasons for insisting that no photographs be taken of the crime scene, the officers gave that command only *after* Roach had removed the BB gun from inside Josue's car and placed it on the car's roof. So any photographs that

4

might otherwise have been taken at that point would not have illuminated the location of the gun within the car when Josue was shot or immediately thereafter.

Gallardo also asserts that there are a few inconsistencies between the deputies' versions of events and that Calvert had previously shot an unarmed suspect who he claimed was arming himself. Where, as here, the defendants are the only witnesses to the incident because the plaintiff's decedent was killed, we must carefully examine "circumstantial evidence that, if believed, would tend to discredit the police officer's story," including assessing "whether the officer's story is internally consistent and consistent with other known facts." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). Here, although a reasonable jury could conclude that Calvert's account seems embellished or internally inconsistent at times,[2] any such inconsistencies do not create a reason to doubt Roach's *consistent* account that he saw Josue draw a pistol from his pocket and begin to open the car door, that he did not shout "gun," and that he fired at Josue, before Calvert did, because he thought Calvert was about to be shot. Roach had a clear line of sight through Josue's passenger-side window, illuminated with a thousand-lumen flashlight. Within seconds of the incident, Roach stated on his handheld radio that Josue "[h]ad a gun in his right hand" and had moved it in Calvert's direction.

---

[2] For instance, although Calvert maintains he heard Roach yell "gun" before he began shooting at Josue, Roach does not recall shouting "gun," and no such statement is audible in the dash-cam video of the encounter.

5

Although the deputies' dash-cam video of the encounter does not show what happened inside Josue's car, the video in no way contradicts Roach's account, which has remained internally consistent over time.

The record also does not support Gallardo's suggestion that Josue's car windows were tinted, which would have obscured Roach's view. Roach stated that he did not recall any tint being on the vehicle. Although Calvert noted that the windows had a "dark green" color and that "it was hard" for him to see through them while he approached from behind the car, he distinguished the green hue of the glass itself from window tinting, which entails "a black film put on the back side of a window." In any event, photographs of Josue's car show that the passenger-side window was sufficiently clear, and that Roach would have been able to see through it with his flashlight.

Last, citing *Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001), Gallardo argues that Calvert and Roach were on notice that Josue was suicidal and that they should have considered his unstable mental state during the encounter. The district court correctly concluded that *Deorle* is inapposite. In *Deorle*, an officer fired a beanbag round at the face of Richard Deorle, an emotionally disturbed man who had "lost control of himself" but who had not attacked anyone. *Id.* at 1275–78. The firing officer observed Deorle for "about five to ten minutes from the cover of some trees." *Id.* at 1277. When Deorle—then unarmed and holding only "a can or

6

a bottle of lighter fluid"—walked toward him, the officer fired at him without first ordering him to halt. *Id.* at 1277–78. The court explained that "the fact that Deorle was walking on his own property in [the officer's] direction with a can or bottle in his hand is insufficient by any objective measure to justify the force deployed." *Id.* at 1282. The court also emphasized that the situation there "was far from that of a lone police officer suddenly confronted by a dangerous armed felon threatening immediate violence." *Id.* at 1283.

Here, by contrast, Josue was in possession of what appeared to be a pistol, and no admissible evidence contradicts Roach's account that Josue drew the gun from his pocket and pointed it toward Calvert. Moreover, unlike in *Deorle*, the deputies here issued an order to Josue before shooting, commanding him to show his hands after he failed to tell them whether he had a gun. Josue did not comply. Instead, and unlike in *Deorle*, Roach saw Josue "reach[] for a gun in his" pocket, retrieve a gun, and begin to point it at Calvert. *Cruz*, 765 F.3d at 1078. When "a suspect threatens an officer with a weapon such as a gun," the officer generally "is justified in using deadly force." *Smith*, 394 F.3d at 704. We therefore hold that there are no triable issues of fact as to the reasonableness of the deputies' use of force.

2. Because we affirm the district court's holding that there are no triable issues of fact as to whether the deputies' use of force was objectively reasonable,

7

we do not address whether they would alternatively be entitled to qualified immunity.

**AFFIRMED.**